```
1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
2                         WESTERN DIVISION


3

     UNITED STATES OF AMERICA,      Case No. 3:22-cr-00224-JGC-1
4                                   Toledo, Ohio
              Plaintiff,
5
          vs.                       Wednesday, April, 20, 2022
6


7    CODY BROWN,


8                Defendant.


9


10          TRANSCRIPT OF DETENTION HEARING PROCEEDINGS
             BEFORE THE HONORABLE DARRELL A. CLAY
11                UNITED STATES MAGISTRATE JUDGE


12

     APPEARANCES:
13
     For the Government:       Sara Ann Al-Sorghali,
14                             Assistant United States Attorney

15


16   For the Defendant:       Donna M. Grill,
                               Tonya Carr,
17                             Assistant Federal Public Defenders


18   Also Present:            Cheryce Burton,
                               U.S. Pretrial & Probation Office
19


20


21   Official Court Reporter:  Stacey L. Kiprotich, RMR, CRR
                               United States District Court
22                             1716 Spielbusch Avenue, Suite 120
                               Toledo, Ohio 43604
23                             (419) 213-5520


24

     Proceedings recorded by mechanical stenography from a
25   digital audio recording, transcript produced by
     computer-aided transcription.
```

1                              I N D E X

2

**GOVERNMENT'S WITNESSES**                              **PAGE**

1.  DONALD WIDMER, TFO
            DIRECT EXAMINATION BY MS. AL-SORGHALI     28
            CROSS-EXAMINATION BY MS. GRILL            36


**DEFENDANT'S WITNESSES**                              **PAGE**

1.  JESSICA BROWN
            DIRECT EXAMINATION BY MS. GRILL           16
            CROSS-EXAMINATION BY MS. AL-SORGHALI      23
            EXAMINATION BY THE COURT                  26

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **Wednesday, April 20, 2022**

2                  - - -

3          **(Afternoon Session)**

4                  - - -

5          THE COURT:  Ms. Hancock, will you call the

6    case, please?  You are on mute -- your setting -- if you

7    called it already.

8          COURTROOM DEPUTY:  Sorry about that, Judge.

9       This United States District Court is now in session.

10   The Honorable Darrell A. Clay presiding.  This is Case

11   Number 3:22-mj-5100, the United States versus Cody Brown.

12   The matter comes on for a detention hearing.

13          THE COURT:  Ladies and gentlemen, good

14   afternoon.

15       If we could start with appearances, please, on behalf

16   of the United States.

17          MS. AL-SORGHALI:  Good afternoon, Your Honor.

18       Sara Al-Sorghali, attorney for the Government.

19          THE COURT:  Good afternoon, Ms. Al-Sorghali.

20       And on behalf of the defendant, Cody Brown?

21          MS. GRILL:  Good afternoon, Your Honor.

22       Donna Grill here for Mr. Brown.  And, also, Tonya Carr

23   is here from my office.

24          THE COURT:  Good afternoon, Ms. Grill.

25       Good afternoon Ms. Carr.

1          Mr. Brown, can you hear me okay?

2               THE DEFENDANT:  Yes, sir.

3               THE COURT:  All right.  As a reminder, my name

4     is Darrell Clay, United States Magistrate Judge here at the

5     federal courthouse in Toledo.

6          We are here for a detention hearing because in

7     connection with the criminal charge that's been filed

8     against you, the United States has requested that you be

9     detained, and your attorney has proposed that you be

10    released on various conditions.

11         We're conducting the hearing pursuant to Title 18 of

12    the United States Code Section 3142.  The sole issue before

13    me is whether there is a condition or a combination of

14    conditions that will reasonably assure the safety of other

15    persons and the community and Mr. Brown's appearance.

16         Ms. Al-Sorghali, does the Crime Victims' Rights Act

17    apply to this proceeding?

18               MS. AL-SORGHALI:  It does not.

19               THE COURT:  Mr. Brown, during today's

20    proceeding, I have to ask you a few questions.  Some of

21    those questions are going to sound familiar because they

22    will track some of the questions I asked you during your

23    initial appearance.  Regardless, I'm not going to ask you

24    anything about the substance of the charges that have been

25    filed against you.  And any questions that I do ask you,

1    you're obligated to answer truthfully under the penalties of

2    perjury; so I want to start by swearing you in.

3         Raise your right hand, sir.

4                        -  -  -

5                   (Defendant was sworn)

6                        -  -  -

7                   THE COURT:  Tell us your full name, please.

8                   THE DEFENDANT:  Cody Robert Brown.

9                   THE COURT:  How old are you?

10                  THE DEFENDANT:  31.

11                  THE COURT:  And you received your GED; is that

12   right?

13                  THE DEFENDANT:  Yes, sir.

14                  THE COURT:  All right.  Well done, sir.

15                  THE DEFENDANT:  Thank you.

16                  THE COURT:  Can you read and write and speak

17   and understand English without assistance from a foreign

18   language interpreter?

19                  THE DEFENDANT:  Yes, sir.

20                  THE COURT:  All right, sir.  In the last 24 to

21   48 hours, have you taken any medications, not taken any

22   regularly prescribed medication, consumed anything else, or

23   engaged in any activity, any --

24                  THE DEFENDANT:  No.

25                  THE COURT:  Hold on one second.  Let me finish

1    the question.

2                    THE DEFENDANT:  Sorry.

3                    THE COURT:  Any of those four things that

4    might in any way interfere with your ability to follow

5    along, understand and participate in this proceeding today?

6                    THE DEFENDANT:  I took medicine, but it

7    shouldn't -- it doesn't affect my head or anything.

8                    THE COURT:  Okay.  As we sit here now, you've

9    got a clear mind?  You know where you are?

10                   THE DEFENDANT:  Yes, sir.

11                   THE COURT:  You know our purpose for being in

12   court?

13                   THE DEFENDANT:  Yes, sir.  It was just for my

14   ulcers and stuff and my blood pressure.

15                   THE COURT:  All right.  Thank you.

16        Ms. Grill, do you have any concerns about Mr. Brown's

17   competency?

18                   MS. GRILL:  I do not.

19                   THE COURT:  Ms. Al-Sorghali, does the United

20   States?

21                   MS. AL-SORGHALI:  We do not.

22                   THE COURT:  Before we proceed further, we

23   continue to be affected by the COVID-19 pandemic.  As a

24   result, this proceeding is being conducted pursuant to the

25   authority provided by Section 15002 of the CARES Act and the

1    standing orders issued by our Chief Judge pursuant to that

2    act.

3            For the record, all counsel are appearing by video

4    conference, as is Mr. Brown.

5            We also have some potential witnesses here who are

6    also appearing by video.  Ms. Brown and Ms. Brown, good

7    afternoon to you both.  We'll get to you shortly.

8            I would also note for the record that we are not

9    currently joined by a representative from the Pretrial and

10   Probation Office.  I believe they are short staffed this

11   week.

12           Ms. Al-Sorghali, does the United States have any

13   objection to the Court proceeding without the personal

14   participation of a representative of Pretrial Services?

15                   MS. AL-SORGHALI:  We do not, Your Honor.

16                   THE COURT:  Ms. Grill, same question to you,

17   ma'am.

18                   MS. GRILL:  No, Your Honor, we do not.

19                   THE COURT:  All right.  Thank you.

20           So let me turn to covering the things required by the

21   CARES Act.

22           Ms. Al-Sorghali, can you see and hear the other

23   participants today?

24                   MS. AL-SORGHALI:  I can.

25                   THE COURT:  Ms. Grill, can you?

1          MS. GRILL: Yes, Your Honor.

2          THE COURT: And, Mr. Brown, are you able to

3    hear and see folks on the screen in front of you?

4          THE DEFENDANT: Yes, sir.

5          THE COURT: Ms. Al-Sorghali, if there's a

6    technology problem affecting the audio or video on your end,

7    will you please bring that to my attention?

8          MS. AL-SORGHALI: I will.

9          THE COURT: Ms. Grill, will you do the same?

10          MS. GRILL: Yes, Your Honor.

11          THE COURT: And, Mr. Brown, same question to

12    you. Will you do something to let me know as soon as

13    problem if there is a problem on your end?

14          THE DEFENDANT: Yes, sir.

15          THE COURT: All right. Thank you, all.

16       Ms. Grill, have you had the opportunity to consult

17    with Mr. Brown in advance of today's proceeding?

18          MS. GRILL: I have.

19          THE COURT: Do you need any further time to

20    consult with him now, or are you able to proceed?

21          MS. GRILL: We're ready to proceed.

22          THE COURT: All right. And, Mr. Brown, I know

23    we had a video hearing in your case once before. Have you

24    had the chance to discuss with Ms. Grill any issues or

25    concerns you may have about the continued use of

1      videoconferencing in your case?

2                          THE DEFENDANT:  Yes, sir.  Everything is fine.

3                          THE COURT:  Based upon that, you're willing to

4      continue using videoconference, Mr. Brown?

5                          THE DEFENDANT:  Yes, sir.

6                          THE COURT:  Ms. Grill, are you?

7                          MS. GRILL:  Yes, Your Honor.

8                          THE COURT:  And, Ms. Al-Sorghali, for the

9      United States?

10                         MS. AL-SORGHALI:  We are.

11                         THE COURT:  Thank you, all.

12          Based upon the foregoing, I'll find that Mr. Brown has

13     knowingly and voluntarily agreed to participate in today's

14     proceeding by videoconference.  Let's begin.

15          Ms. Al-Sorghali, will you please summarize the charges

16     against Mr. Brown, as well as the potential penalties in the

17     event of a conviction.

18                         MS. AL-SORGHALI:  Certainly, Your Honor.

19     Your Honor, as it stands, the defendant is currently charged

20     with one count of possession with intent to distribute a

21     controlled substance.  If convicted, he faces a possible

22     penalty of a mandatory minimum of 10 years to life in

23     prison; possible fine, $250,000; 3 years of supervised

24     release; and a $100 assessment.

25                         THE COURT:  Thank you.

1          Ms. Grill, do you believe that's an accurate summary?

2                    MS. GRILL:  Yes, Your Honor.

3                    THE COURT:  All right.  And, Mr. Brown, have

4     you had some opportunity -- don't tell me anything you did

5     discuss with Ms. Grill, but have you had some opportunity to

6     discuss the allegations of this case with Ms. Grill?

7                    THE DEFENDANT:  Yes, sir.

8                    THE COURT:  All right.  And, Ms. Al-Sorghali,

9     you've received the reports from Pretrial Services?

10                    MS. AL-SORGHALI:  I have, and I've had an

11    opportunity to review those reports.

12                    THE COURT:  All right.  The Government has

13    otherwise had sufficient opportunity to prepare for today's

14    proceeding?

15                    MS. AL-SORGHALI:  We have.

16                    THE COURT:  Ms. Grill, have you had

17    sufficient -- have you received both reports from Pretrial

18    Services?

19                    MS. GRILL:  I have, Your Honor, and I have

20    reviewed both.

21                    THE COURT:  And you've had enough time

22    otherwise to prepare for today?

23                    MS. GRILL:  Yes, Your Honor.

24                    THE COURT:  Ms. Al-Sorghali, it would appear

25    to me that there's a statutory presumption in this case

1    because of the charge.

2         Is that the Government's view?

3              MS. AL-SORGHALI:  That is.

4              THE COURT:  Ms. Grill, do you see it any

5    differently?

6              MS. GRILL:  No, Your Honor.

7              THE COURT:  Mr. Brown, let me explain.

8    Because of the charges that have been brought against you,

9    by statute, Congress has established a presumption, which is

10   a fancy word for a starting point.  So under 18 U.S.C.

11   3142, I have to start my analysis today with the assumption

12   that there is no set -- there's no condition or set of

13   conditions that will reasonably assure the safety of the

14   community and your appearance.

15        Through this proceeding, with the assistance of your

16   lawyer, you have the opportunity to rebut this presumption.

17   At the end of the day, it's the United States that bears the

18   overall burden of persuading me that a request to detain you

19   pending further proceedings in this case is appropriate.

20        And none of that has anything to do with the

21   presumption of innocence.  You come to court being cloaked

22   with the presumption of innocence.  That never changes

23   unless and until the jury says otherwise.  So you are

24   presumed innocent and the Court treats you as such.

25        Does all that make sense, Mr. Brown?

1                    THE DEFENDANT:  Yes, sir.  Thank you.

2                    THE COURT:  All right.  So as I indicated, Mr.

3      Brown has the burden to rebut the presumption of detention.

4      Now, Mr. Brown, with the assistance of your attorney through

5      this hearing, you will have the right to cross-examine any

6      witnesses and to present any evidence opposing the

7      Government's request for your detention.

8           And you also have the right to testify, but you are

9      not required to do so.  You have the right to remain silent,

10     just as we talked about during your initial appearance.

11          Also, you have the right to consult with Ms. Grill at

12     any point during the hearing.  If we're in the middle of

13     something, raise your hand.  I'll find out what's going on,

14     whether it's a technology problem, or you need to discuss

15     something with her, and if that's what you need, we'll put

16     you in a breakout room and you can have confidential

17     conversations with her.

18          For counsel, the Rules of Evidence will not apply

19     today, other than those with respect to privileges.  Hearsay

20     evidence is admissible.  Both sides have the right to

21     proceed in whole or in part by way of proffer.

22          The evidence and examinations are to be limited solely

23     to the detention determination.  This hearing is not to be

24     used to obtain discovery or to produce testimony that can be

25     used for subsequent impeachment purposes, and I won't

1    consider any motion to suppress evidence or objection to

2    evidence allegedly obtained unlawfully.

3         Because the presumption of detention is

4    (indiscernible) here, Ms. Grill, I'm going to give you the

5    opportunity to lead off.  I would ask that you present your

6    conditions, then we'll turn to any evidence or proffer that

7    you wish to make.  You can incorporate your argument as we

8    go along.

9         Ms. Al-Sorghali, the Government will have the

10   opportunity to present any evidence or proffer, and then

11   we'll turn back to you, Ms. Grill.  And to the extent that

12   we need any follow-up argument after all of that, we'll do

13   so.

14        As I said, the sole issue for determination today is

15   whether there is a condition or a combination of conditions

16   that will reasonably assure the safety of other persons and

17   the community and the appearance of Mr. Brown.

18        The evidentiary standards are as follows:  There must

19   be clear convincing evidence that no condition or

20   combination of conditions will reasonably assure the safety

21   of other persons or the community, or there must be a

22   preponderance of the evidence that no condition or

23   combination of conditions will reasonably assure Mr. Brown's

24   appearance.  I think that covers our ground rules for today.

25        Ms. Al-Sorghali, is the United States prepared to

1    proceed?

2                    MS. AL-SORGHALI:  We are.

3                    THE COURT:  Ms. Grill, are you prepared to

4    proceed?

5                    MS. GRILL:  Yes, Your Honor.

6                    THE COURT:  All right.  Ms. Grill, you have

7    the floor, ma'am.

8                    MS. GRILL:  Thank you, Your Honor.  To outline

9    our proposed conditions, we are proposing that my client's

10   wife, Jessica Brown, act as the custodian, with my client

11   being on home detention with electronic monitoring.

12        Further, I have Ms. Peggy Brown here who is my

13   client's mother.  She's willing to go over to Jessica's home

14   while Jessica is at work and, at the very least, check in on

15   him and/or stay for however long is necessary.  My client is

16   hoping to work at some point; but at least until he's able

17   to secure employment, that would be our arrangement.

18        I do plan on having Jessica testify.  I was just going

19   to proffer the situation with Ms. Brown because Tonya Carr,

20   our investigator, did speak at length with Peggy Brown.

21        In addition to that, I think my client needs drug and

22   alcohol assessment, based on the information that we have

23   from the pretrial report.  I am not a treatment provider.  I

24   can only say that I would think that he should do the

25   recommendation -- follow any and all recommendations of the

1    provider.  He is understanding that could be some sort of

2    inpatient treatment initially, followed up with more

3    intensive outpatient treatment.  But whatever the treatment

4    recommendation would be, he's obviously willing and wanting

5    to follow it.  That would be our main condition.

6         He would like to be employed, so we would be

7    requesting that the home detention with electronic

8    monitoring, once he gets through the treatment portion that

9    he would need to get through, that he would be able to be in

10   a position to leave the home in order to be employed.

11        And, with that, I have Ms. Jessica Brown here and I

12   can have her testify.

13             THE COURT:  All right.  Ms. Grill, my only

14   request would be, because we have a Ms. Brown and a Ms.

15   Brown today, is -- not to be impolite, but if we could just

16   use first names so that the record is very clear whether

17   we're speaking about the wife, who is Jessica Brown, or the

18   mother, who is Peggy Brown.

19        Ladies, I intend no disrespect.  We observe decorum

20   and formalities here, but sometimes clarity of the record

21   trumps politeness, so we'll refer to you by your first

22   names, but we don't intend to be improper in any way, shape

23   or form.

24        So, Jessica, I'm going to go ahead and swear you in

25   now.  If you'll raise your right hand, please.

16

Jessica Brown (Direct)

1                          -  -  -

2                    (Witness was sworn)

3                          -  -  -

4            THE COURT:  Okay.  Thank you.

5        Ms. Grill, you can proceed.

6                MS. GRILL:  Thank you.

7        **DIRECT EXAMINATION OF JESSICA BROWN**

8    **BY MS. GRILL:**

9    **Q.**    Jessica, can you state your full name for the record?

10   **A.**    Jessica Brown (indiscernible).

11   **Q.**    Jessica, what I -- I said can you state your full

12   named for the record.  Are you able to hear me?  Are you

13   having an issue?

14   **A.**    Now I can.

15   **Q.**    Now you can.  Okay.

16        Go ahead and repeat your full name for the record.

17   **A.**    Jessica Nicole Brown.

18   **Q.**    Thank you.

19        And, Jessica, what town are you living in right now?

20   **A.**    Willard Ohio, Huron County.

21   **Q.**    And is that on Neal Zick Road?

22   **A.**    Yes, ma'am.

23   **Q.**    Okay.  Thank you.

24        And are you related to Cody Brown?

25   **A.**    Yes.  He is my husband.

Jessica Brown (Direct)

1    **Q.**    And how long have you guys been married?

2    **A.**    Married for six years, together nine.

3    **Q.**    And do you have children with Cody?

4    **A.**    Yes, I do, ma'am.

5    **Q.**    We don't need their names for the record, but could

6    you at least tell me how many and their ages?

7    **A.**    Two little girls, a nine -- an eight-year-old and a

8    one-year-old, and then he adopted my son who is nine.

9    **Q.**    And do any of your children have any medical issues?

10   **A.**    My daughter.  She has stage 4 neuroblastoma.

11   **Q.**    Is that a type of cancer?

12   **A.**    Yes, it is, ma'am.

13   **Q.**    And is she currently in -- I'm going to say the

14   word -- remission?  That may be a medical word that I might

15   not `be able to be using correctly, but is she --

16   technically, is she in remission right now?

17   **A.**    She is in remission.  She does go up to the hospital

18   to get examined every three months, but she is in remission.

19   **Q.**    So she had treatment for that previously?

20   **A.**    Yes.

21   **Q.**    Are you currently working right now?

22   **A.**    Yes, I work full time at Berry Plastics in

23   Monroeville.

24   **Q.**    And are you -- you're sitting in a car.  Are you

25   currently outside of your employment right now?

Jessica Brown (Direct)

1    **A.**    Yes, ma'am.

2    **Q.**    What are your normal work hours?

3    **A.**    I usually leave the house about 6:30, and I get home

4    around 3:45, 4:00 o'clock.

5    **Q.**    Okay.  So you have three children at home.  Who is

6    caring for those children when you are away at work?

7    **A.**    Either Peggy Brown or the daycare.

8    **Q.**    Okay.  I'm assuming your eight-year-old is in school;

9    correct?

10   **A.**    Oh, yes.

11   **Q.**    And, I apologize, how old is your son?

12   **A.**    Nine.

13   **Q.**    And he's also in school, I'm assuming?

14   **A.**    Correct, ma'am.

15   **Q.**    Okay.  You had mentioned that Peggy Brown helps out

16   with child care.  About how often a week does she help you?

17   **A.**    Let's see.  Last week she was over about four days and

18   then I was off one.  So about four or five -- she's there

19   often, very often, because she watches my older -- my little

20   brother I adopted; so she's there very, very often.

21   **Q.**    And what town does Peggy live in?

22   **A.**    Sycamore, Ohio, which is (indiscernible).

23   **Q.**    Okay.  How far is that from your residence?

24   **A.**    About 35, 36 minutes in between.

25   **Q.**    And despite the distance, she's still over at your

Jessica Brown (Direct)

1    home quite frequently?

2    **A.**    Always, ma'am.

3    **Q.**    So if she were to be coming by to help out with Cody,

4    that wouldn't change the normal regular kind of

5    day-to-day -- what you're doing right now?

6    **A.**    Not at all.

7    **Q.**    And you heard me put on the record the conditions,

8    which is -- that we're proposing, which would be that you

9    would be the custodian.

10            Do you understand that?

11   **A.**    Yes, ma'am.

12   **Q.**    And let's back up a little bit.  When Cody was

13   arrested, was he living with you?

14   **A.**    No, we were separated.  He was living in Tiffin.

15   **Q.**    I believe the pretrial report might say Sandusky, so I

16   just want to make sure we're clear.  It's your understanding

17   that he was residing actually in Tiffin, Ohio?

18   **A.**    Yes, ma'am.

19   **Q.**    Okay.  And how far is Tiffin from you?

20   **A.**    Probably about a 35-, 40-minute drive.

21   **Q.**    Okay.  How long have you been residing separately?

22   **A.**    About five or six months.  About six or so.  It's been

23   a while.

24   **Q.**    Okay.  Were you still communicating?

25   **A.**    Yes.

Jessica Brown (Direct)

1    **Q.**    Was he still seeing the children?

2    **A.**    Yes.

3    **Q.**    So as I stated, our proposal is to have you as the

4    custodian.

5            Do you understand that?

6    **A.**    Yes, I do, ma'am.

7    **Q.**    So with that would be Cody coming back to live in your

8    home.

9            Do you understand that?

10   **A.**    Yes, ma'am.

11   **Q.**    Are you okay with that?  I mean, you haven't been

12   living with him for five or six months.

13   **A.**    I am.

14   **Q.**    You would be comfortable welcoming him back into the

15   home?

16   **A.**    Yes, ma'am.

17   **Q.**    Now, he would be under a set of rules.

18           Do you understand that?

19   **A.**    Yes.

20   **Q.**    And your job would be to enforce those rules.  So if

21   he were to do something that was wrong, you would have to

22   report him.

23           Do you understand that?

24   **A.**    Yes, I do.

25   **Q.**    Are you willing to do that?

Jessica Brown (Direct)

1    **A.**    Yes.  I actually talked with Cheryce I think her name

2    is, and I explained to her I would give her the heads up.  I

3    would give her anything she would like to know.

4    **Q.**    Okay.  Even if he's going to get mad at you

5    potentially?

6    **A.**    Yes.

7    **Q.**    Now, this could go on for a number of months.  I --

8    federal cases take a while.  It could be six months, could

9    be a year that he would be residing with you and you acting

10   as custodian.

11        Are you comfortable that?

12   **A.**    Yes, ma'am.

13   **Q.**    And are you willing to serve in that capacity?

14   **A.**    Yes.

15   **Q.**    Are you comfortable with having Peggy come several

16   days a week or while you're at work to stay with your

17   husband to make sure he's doing what he's supposed to be

18   doing?

19   **A.**    Peggy knows she's more than welcome.  So, no, there's

20   no problem there at all.

21   **Q.**    Have you spoken with Cody on the phone since he's been

22   arrested?

23   **A.**    Yes, ma'am.

24   **Q.**    If you were to guess, about how many times have you

25   talked to him?

Jessica Brown (Direct)

1    **A.**   Might be a handful of times.

2    **Q.**   And was that while he was at the Lucas County Jail?

3    **A.**   Yes.

4    **Q.**   At one point, did you two discuss the quote/unquote

5    "camper"?

6    **A.**   When it was probably the second phone call I want to

7    say.  Beginning of his arrest.  It was early in the arrest,

8    and it's been about a month now.

9    **Q.**   Okay.  So to give the Court a little bit of

10   information, what is this camper -- where is this camper?

11   Let's start there.

12   **A.**   The camper is at an abandoned house that his mom owns.

13   We store, like, old cars out there, burn trash there.  It's

14   just, like, a mini little junkyard.

15   **Q.**   And is there anything around the camper or connected

16   to the camper that in your mind has value?

17   **A.**   Yes, my generator.

18   **Q.**   Okay.  And did you discuss this generator with Cody

19   during phone calls?

20   **A.**   Yes.  I've discussed with him and his mother actually

21   because I wanted the generator home.  I paid for it.  It's

22   mine.  It's expensive.  It's mine.

23              MS. GRILL:  Okay.  I don't believe I have any

24   other questions, Your Honor.  Thank you.

25              THE COURT:  All right.  Ms. Brown, the

Jessica Brown (Cross)

1    attorney for the Government, Ms. Al-Sorghali, now has a

2    chance to ask you some questions.

3         Ms. Al-Sorghali, you can proceed with your

4    cross-examination.

5              MS. AL-SORGHALI:  Thank you, Your Honor.

6                **CROSS-EXAMINATION OF JESSICA BROWN**

7    **BY MS. AL-SORGHALI:**

8    **Q.**    Ms. Brown -- Ms. Jessica Brown, you indicated that you

9    and Cody Brown are separated.  Why are the two of you

10   separated?

11   **A.**    We just had some personal problems.

12   **Q.**    Are you aware of --

13   **A.**    (Indiscernible)

14   **Q.**    Are you aware of his substance abuse issues?

15   **A.**    I had a hint that he was back into his activity, but I

16   didn't know he -- we were separated.  I was in one town.  He

17   was in a different town.  It's hard.

18   **Q.**    What sort of hint -- what sort of hints did you have?

19   You said you had some hints about it.  What sort of hints?

20   **A.**    Just he started distancing himself from me, wouldn't

21   answer his phone calls, and little things, like, you know --

22   you know somebody after nine years.

23   **Q.**    I know Ms. Grill had asked you about conversations

24   that you and your husband had while he's in custody at the

25   jail.  As a result of those conversations, did DEA agents

Jessica Brown (Cross)

1  actually come and talk to you?

2  **A.**    Yes, ma'am, they did.

3  **Q.**    Okay.  And not only did they speak to you, but they

4  actually gave [sic] permission from you and from Ms. Peggy

5  Brown to go into that trailer; correct?

6  **A.**    Yes, they did.

7  **Q.**    And once inside that trailer, are you aware that they

8  found three guns, more methamphetamine, Narcan, and several

9  drug packaging items?  Are you aware of that?

10  **A.**    No, I was not aware because nobody informed me.

11  **Q.**    Okay.  Did Cody ever tell you that that was what was

12  going to be inside the trailer when he told you to go to the

13  trailer?

14  **A.**    No.

15  **Q.**    Okay.  And if I told you he reported he uses

16  fentanyl -- one second -- he uses heroin every other day,

17  you're not aware of that?

18  **A.**    (Indiscernible) I knew he had a past history of

19  substance abuse, but I didn't -- like I mentioned, I

20  don't -- I had a hint, but I wasn't sure if he was -- we

21  were two different towns away.

22  **Q.**    Okay.  And if this -- I'm still going to ask the

23  question.  It's probably going to be the same answer for

24  you.  But he reported he uses fentanyl weekly, and also, he

25  reported he uses methamphetamine once every few weeks.

25

Jessica Brown (Cross)

1      Again, you're aware -- you're not aware of him

2   reporting that?

3   **A.**    No.

4   **Q.**    Obviously, you guys have -- I think you indicated you

5   guys were married for six years, been together for nine

6   years.  So you're aware of his criminal history; right?

7   **A.**    Yes, I am, ma'am.

8   **Q.**    Okay.  So you're aware of his prior convictions for

9   drug trafficking, prior conviction for having weapon while

10   under disability?

11   **A.**    Yes.

12   **Q.**    Okay.  And I'm not sure if you're aware -- are you

13   aware of what he's currently -- I guess the details of which

14   he's currently charged with here; why we're here today?

15   **A.**    I do a little bit from what I just heard and what

16   Donna has told me.  That's all I really know.

17   **Q.**    You're aware that the charge is possession with intent

18   to distribute controlled substances?

19   **A.**    I don't know what that means, but I figured it's

20   pretty bad.

21   **Q.**    Okay.  Essentially drug trafficking.  Are you aware of

22   that?

23   **A.**    I am now.

24           MS. AL-SORGHALI:  No more questions,

25   Your Honor.

Jessica Brown (Examination by the Court)

1      THE COURT:  Ms. Grill, any redirect?

2      MS. GRILL:  I'm pondering.

3      No, Your Honor.

4      **EXAMINATION OF JESSICA BROWN**

5      **BY THE COURT:**

6      **Q.**   All right.  Jessica, I've got a few questions for you,

7      and I don't mean to unduly pry, but there's some additional

8      information I need.

9          Talk to me about the home you would be living in.

10     How many bedrooms?  What would the living arrangements be

11     for you, Mr. Brown, and the children?  Who's --

12     **A.**   I have a --

13     **Q.**   -- going to be sleeping where?

14         Go ahead.  I'm sorry.

15     **A.**   No.  You're fine.

16         I have a three-bedroom trailer.  I own my trailer.  I

17     live in Willard.  There's three bedrooms.  My kids have

18     their bedroom.  I have my bedroom.  They have --

19     (indiscernible) but it's a safe environment.

20     **Q.**   Okay.  Well, no, I take that at face value.  You and

21     Mr. Brown have been separated.  It sounds like would he be

22     sharing the one bedroom with you?  Or is he going to reside

23     in the third bedroom?

24     **A.**   He can reside in my room.  And there is as couch

25     still, but he can reside in my room (indiscernible).

1           THE COURT:  All right.  And -- okay.  Thank

2   you.  That was the information I needed.

3       Ms. Grill, do you have any follow-up questions?

4           MS. GRILL:  No, Your Honor.  Thank you.

5           THE COURT:  Ms. Al-Sorghali, any follow-up

6   questions based upon the Court's questions?

7           MS. AL-SORGHALI:  No, Your Honor.

8           THE COURT:  All right.  Jessica, thank you for

9   your testimony today.  We appreciate it.

10      Ms. Grill, further evidence or proffer?

11          MS. GRILL:  Your Honor, I don't have any

12  further witness testimony.

13      Again, we would just proffer that Peggy Brown is

14  willing to go over to Jessica Brown's residence and stay

15  with Cody.  It wouldn't be a change of what they've been

16  doing already.  So it's -- it wouldn't be an undue burden to

17  her, at least that's what she's communicated to us.  She's

18  been doing that pretty regularly anyway.

19      Ms. Brown is -- Peggy Brown I believe is about

20  70 years old.  She's able to get back and forth between her

21  residence and Jessica's residence, but I don't envision that

22  being an issue.  I think those two together can keep an eye

23  on him and be the resources that the Court would need to

24  make sure that he's doing what he's supposed to be doing.

25          THE COURT:  All right.  Thank you, Ms. Grill.

28

                    Widmer, TFO (Direct)

1          Ms. Al-Sorghali?

2                    MS. AL-SORGHALI:  Your Honor, I do have one

3     witness.  If I may call that witness at this time?

4                    THE COURT:  Of course.

5                    MS. AL-SORGHALI:  Your Honor, the Government

6     calls DEA Donald Widmer.

7                    THE COURT:  All right.  Good afternoon, Agent.

8     Can you hear me okay?  You're sitting a little further back.

9                    THE WITNESS:  Yes, I can.

10                   THE COURT:  All right.  Because you are a

11    little further back, just try to keep your voice up so the

12    microphone picks you up well.

13         Raise your right hand, please.

14                            -  -  -

15                     (Witness was sworn)

16                            -  -  -

17                   THE COURT:  All right.  Thank you.

18         You can proceed, Ms. Al-Sorghali.

19                   MS. AL-SORGHALI:  Thank you, Your Honor.

20         **DIRECT EXAMINATION OF DONALD WIDMER, TFO**

21    **BY MS. AL-SORGHALI:**

22    **Q.**    Agent, can you please introduce yourself?

23    **A.**    Yeah.  I'm Agent Donald Widmer, Task Force Officer

24    with the DEA, and I'm a Perrysburg Township police

25    detective.

Widmer, TFO (Direct)

1   **Q.**     How long have you been with DEA?

2   **A.**     I've been with DEA about since October of 2018.

3   **Q.**     Okay.  What are some of your duties with the

4   organization?

5   **A.**     We investigate drug crimes in the Northwest Ohio

6   District.

7   **Q.**     Are your familiar with an individual named Cody Brown?

8   **A.**     Yeah.

9   **Q.**     How so?

10  **A.**     Starting in March 31st of this year, we were notified

11  by the postal inspectors out of Cleveland that they had

12  interdicted a USPS box, and based on several indicators,

13  they presented that box to a K9 -- a narcotic detection K9

14  who had a positive alert.

15          They then authored a search warrant out of Cleveland

16  and were granted permission to search the box.  Upon

17  searching the box, they located approximately 1.2 kilograms

18  of meth, approximately 855 grams of what were suspected to

19  be blue fentanyl pills, approximately 3 ounces of cocaine,

20  and approximately 1 ounce of suspected heroin.

21  **Q.**     All right.  And I'm going to take a step back here.

22  You talked about what was in the box, and I want to talk

23  about the process in which -- or I guess the -- what

24  happened leading up to you guys actually getting control of

25  this box.

Widmer, TFO (Direct)

1      Did you guys conduct surveillance on the location at

2  which the box was to be delivered?

3  **A.**    Yes.  So when they contacted our office on the 31st,

4  we then went and did surveillance.

5  **Q.**    And when you say -- I don't mean to interrupt.  When

6  you say "they," who are you referring to?

7  **A.**    Postal inspectors --

8  **Q.**    Okay.

9  **A.**    -- out of Cleveland.  Specifically, Postal Inspector

10  Brian Green.  We did surveillance at the delivery address

11  for the box.  It was ▓▓ South Sandusky Street, ▓▓▓,

12  Tiffin, Ohio.  During that time, we noted a vehicle at that

13  location, which a registration check revealed that it was

14  registered to Mr. Brown.

15  **Q.**    And did you see -- or what happened, if anything, once

16  the package -- the suspected package was delivered to that

17  address?

18  **A.**    On April 1st, we conducted a controlled delivery where

19  we delivered the box.  Upon placing it on the porch, we

20  observed Mr. Brown walk past the box into the residence.  A

21  minute later, he came back out of the residence, picked up

22  the box and carried it into the residence, was inside the

23  residence for approximately five minutes, came out of the

24  residence with the USPS box, entered his vehicle with the

25  box and drove away.

Widmer, TFO (Direct)

1    **Q.**    And at that time, did you stop Mr. Brown?

2    **A.**    We did.

3    **Q.**    What happened after you stopped Mr. Brown?

4    **A.**    When we -- once we stopped him, he was handcuffed, he

5    was Mirandized, and we located the box inside of his

6    vehicle.

7    **Q.**    And you indicated you Mirandized him.  Did you

8    ultimately speak to Mr. Brown?

9    **A.**    Yes.  Well, we -- he was transported to the Tiffin

10   Police Department, and he was interviewed, and I was one of

11   the agents that were interviewing.

12   **Q.**    What, if anything, did he tell you?

13   **A.**    During the interview, he admitted to acquiring the

14   drugs in Phoenix, Arizona, and shipping them to himself at

15   the address in Tiffin.

16   **Q.**    And I want to go back.  You talked -- I know you had

17   touched on this a little bit, but I just want to make sure

18   that the record is clear.  Approximately how much meth

19   was -- methamphetamine was contained within that parcel box

20   that Mr. Brown has?

21   **A.**    Approximately 1.2 kilograms.

22   **Q.**    Of methamphetamine; correct?

23   **A.**    Of methamphetamine.

24   **Q.**    And when you said that there was fentanyl -- fentanyl

25   blue pills within that box, approximately how much?

Widmer, TFO (Direct)

1    **A.**    Approximately 855 grams.

2    **Q.**    And those were fentanyl pills; correct?

3    **A.**    It was little blue M30 fake pills.

4    **Q.**    You say "fake," but they are actually fentanyl pills?

5    **A.**    Yes.  They are not real as in manufactured by a

6    pharmaceutical company.

7    **Q.**    Okay.  And 850 grams of fentanyl pills, can you

8    estimate how many fentanyl pills that actually is?

9    **A.**    It's going to be estimated in the neighborhood of

10   8,000.

11   **Q.**    Were there any other drugs located within that parcel

12   box?

13   **A.**    Yes.

14   **Q.**    And what drugs were there?

15   **A.**    Approximately 3 ounces of cocaine, and approximately

16   1 ounce of heroin.

17   **Q.**    Were any drugs located on Mr. Brown's person?

18   **A.**    Yes.

19   **Q.**    What was located on his person, and where was this

20   located?

21   **A.**    When we -- after we placed him in handcuffs, he

22   admitted that he had a plastic bag with approximately a

23   quarter of an ounce of what he said was a combination of the

24   fentanyl pills and heroin, and it was in his butt.

25   **Q.**    And based on your training and experience, is that

Widmer, TFO (Direct)

1    common for traffickers and users to keep drugs in that

2    location, in their cavity -- their anal cavity?

3    **A.**    Yeah.  It's a common (indiscernible) location when

4    they're traveling about.

5    **Q.**    Were there any other individuals who were located on

6    the scene of where this parcel was delivered?

7    **A.**    Yes.  Damion Yoshimoto and Jennifer Murphy were

8    located inside the trailer.

9    **Q.**    Did you interview these two individuals?

10   **A.**    Yes.

11   **Q.**    What statements did they make?  "As it relates to Mr.

12   Brown," I should say.

13   **A.**    They stated that he had been living there.  He had a

14   room that he was -- he was staying there.  He had been there

15   for several months.  They stated that they knew that the

16   package was coming and that it was coming for him.

17   **Q.**    Did either Mr. Yoshimoto or -- I believe you said her

18   name.  What was her name?

19   **A.**    Jennifer Murphy.

20   **Q.**    Jennifer Murphy.  Did either of these individuals

21   indicate that they had been trafficking narcotics on the

22   behalf or at the behest of Mr. Brown?

23   **A.**    Yes.  Jennifer Murphy stated that she was selling the

24   fentanyl pills for Mr. Brown in his -- while he was out of

25   town.

Widmer, TFO (Direct)

1    **Q.**    After you interviewed Mr. Brown, was he subsequently

2    arrested and then taken into custody at the Lucas County

3    Jail?

4    **A.**    Yes.

5    **Q.**    And did you conduct an investigation into the jail

6    calls he made while he was at the Lucas County Jail?

7    **A.**    Yes.

8    **Q.**    And can you elaborate on that?

9    **A.**    Yes.  On April 6th, I was listening to some recorded

10   Lucas County Jail calls between Mr. Brown and Jessica Brown.

11   And during a conversation, they -- Mr. Brown was requesting

12   Jessica Brown go to the camper.  He did that at least twice

13   during the conversation, and it caused me to believe that

14   there was something illegal or potentially drug proceeds at

15   the camper.

16   **Q.**    And did you further investigate those jail calls or

17   investigate those conversations?

18   **A.**    We did.  We went and spoke to Jessica Brown and Peggy

19   Brown.  We explained to them what we had heard and that we

20   suspected there was something illegal in the camper, and we

21   wanted to look inside the camper, and they both gave consent

22   for us to do that and we did.

23   **Q.**    And what was located within that camper?

24   **A.**    We found three firearms and about a half-ounce of

25   crystal methamphetamine, as well as some other pills and

Widmer, TFO (Direct)

1    supplies that are commonly used to traffic drugs, and then

2    scales, baggies, ziploc or vacuum seal type of material.

3    **Q.**    Was there any Narcan in that trailer?

4    **A.**    Yes, there was also some Narcan.

5    **Q.**    And just in case the Court is not aware, can you tell

6    the Court what Narcan is used for?

7    **A.**    Narcan is commonly used to basically offset the

8    effects of opioids.

9    **Q.**    For overdose.

10   **A.**    Or for overdose, yes.  To reverse the overdose effect.

11   **Q.**    Have you had any, I guess, further opportunity to

12   listen to the jail calls between Mr. Brown and Ms. Jessica

13   Brown?

14   **A.**    Yes.

15   **Q.**    Can you describe the general demeanor in which Mr.

16   Brown speaks to Ms. Jessica Brown?  Or has -- "has

17   previously spoken to her," I should say.

18   **A.**    Well, in many of the calls, Mr. Brown talks to Jessica

19   Brown in a very aggressive and threatening manner during the

20   conversations.

21   **Q.**    Does that give you cause for concern as a law

22   enforcement agent?

23   **A.**    It does, yes.

24   **Q.**    Okay.  Do you believe that based on the conversations

25   between Mr. Cody Brown and Ms. Jessica Brown that the

Widmer, TFO (Cross)

1    defendant was trying to destroy evidence or obstruct a

2    criminal investigation?

3    **A.**    That was my belief, yes.

4    **Q.**    Okay.  And, Agent, are you familiar with the

5    defendant's criminal history?

6    **A.**    Yes.

7    **Q.**    What sort of convictions does he have?

8    **A.**    He has convictions for drug trafficking out of the

9    State of Ohio, as well as weapons under disability.

10   **Q.**    And does that complete your investigation at this

11   time?

12   **A.**    Yes.

13              MS. AL-SORGHALI:  Your Honor, we have no

14   further questions.

15              THE COURT:  All right.  Ms. Al-Sorghali, if

16   you could turn that camera back so that Ms. Grill can see

17   Agent Widmer while she's conducting her cross-examination.

18   Thanks.

19        Ms. Grill.

20              MS. GRILL:  Thank you, Your Honor.

21              **CROSS-EXAMINATION OF DONALD WIDMER, TFO**

22   **BY MS. GRILL:**

23   **Q.**    And seeing you on video screen, so it is a little bit

24   different.

25        So I wanted to talk about the camper a little bit.

Widmer, TFO (Cross)

1   You initially went and saw Jessica about the camper;

2   correct?

3   **A.**    Yes.

4                MS. GRILL:  My client was raising his hand.

5   Are you having an issue hearing, Cody?

6                THE DEFENDANT:  No.  I just wanted to speak to

7   you for one second.

8                MS. GRILL:  Okay.

9                THE COURT:  All right.  Let's take a brief

10  recess.  And, Ms. Hancock, if you would place Ms. Grill, Ms.

11  Carr and Mr. Brown in a breakout room, please.

12       Thank you, folks.

13                (Discussion held off the record between

14  defense counsel and the defendant)

15                THE COURT:  All right.  We are rejoined by Mr.

16  Brown and defense counsel.

17       Ms. Grill, are you able to proceed?

18                MS. GRILL:  Yes, Your Honor.

19       I would tell the Court, though, Tonya and are sitting

20  in the same office, and she's having some internet

21  instability issues.  So hopefully that doesn't impact me

22  too, but since we're in the same building, I'm just letting

23  you know.  So if somebody can't hear me, please say

24  something.  Okay?

25                THE COURT:  We'll do our best to let you know.

Widmer, TFO (Cross)

1          MS. GRILL:  Thank you.

2          THE COURT:  I'm sorry.  Hold on one second.  I

3    want the record to reflect that Pretrial Officer Cheryce

4    Burton has just joined us.

5          Good afternoon, Ms. Burton.

6               PRETRIAL OFFICER BURTON:  Good afternoon.

7          THE COURT:  Ms. Grill, you can proceed with

8    your cross-examination.

9          Agent Widmer, just as a reminder, you remain under

10   oath.

11             MS. GRILL:  Thank you.

12   **BY MS. GRILL:**

13   **Q.**   Agent, I want to talk about the camper a little bit.

14   So it's my understanding you went to Jessica's house first;

15   correct?

16   **A.**   Yes.

17   **Q.**   And you talked to her for a little while?

18   **A.**   Yes.

19   **Q.**   About the camper, essentially, and other things?

20   **A.**   Yes.

21   **Q.**   And while you were there, she actually had folks from

22   the adoption agency, I'll call it, that were there to speak

23   to her about adopting her brother, and she told you that;

24   correct?

25   **A.**   Yes.  She indicated that they were inside.

Widmer, TFO (Cross)

1    **Q.**    But fair to say she remained cooperative with you --

2    **A.**    Yes, ma'am.

3    **Q.**    -- is that right?

4          And at that point, she told you she didn't have a key

5    to the camper; correct?

6    **A.**    No.  What she said was -- she said that there was a

7    code for the camper door, and if that didn't work -- she

8    gave us the code, and said if that didn't work, that she

9    could get the key.

10   **Q.**    She told you she could get the key?

11   **A.**    Yes.

12   **Q.**    That she knew where the key was?

13   **A.**    Yeah.  I believe she indicated it was on the set of

14   keys that Cody had on his -- the key chain when we arrested

15   him.  That had been returned to her that day because it had

16   the car keys on it and stuff.  She got possession of the

17   car.

18   **Q.**    So you then went to his mom's; correct?

19   **A.**    Yes.

20   **Q.**    And talked to his mom for a little bit, and she showed

21   you where the camper was; right?

22   **A.**    Yes, ma'am.

23   **Q.**    So she was cooperative?

24   **A.**    She was.

25   **Q.**    And she did what you had asked her to do?

Widmer, TFO (Cross)

1    **A.**    Yes.

2    **Q.**    So we have Jessica and his mom both being cooperative

3    with law enforcement; correct?

4    **A.**    Yes.

5    **Q.**    In fact, arguably, doing something that may have made

6    Cody not so happy?  Fair?

7    **A.**    Yes.

8    **Q.**    Okay.  His mom didn't have the code for the camper;

9    correct?

10   **A.**    Correct.

11   **Q.**    And she didn't have a key to the camper; correct?

12   **A.**    Correct.

13   **Q.**    And were you able to get in with the code?

14   **A.**    It turned out that this camper did not have a code.

15   When we arrived, we -- we were prepared to put in the code,

16   but it -- the lock for the camper was not a code.  It was a

17   traditional key lock.

18   **Q.**    So you didn't have the key at that point?

19   **A.**    No.

20   **Q.**    And was it locked?

21   **A.**    Yes.

22   **Q.**    I mean, fair to say there is no reason to believe that

23   Jessica or Peggy had any clue what was in the camper?

24   **A.**    No.

25             MS. GRILL:  I don't think I have anything

1     further, Your Honor.  Thank you.

2               THE COURT:  Ms. Al-Sorghali, redirect?

3               MS. AL-SORGHALI:  No redirect, Your Honor.

4               THE COURT:  All right.  Agent Widmer, thank

5     you for your testimony today.

6       Ms. Al-Sorghali, anything further on behalf of the

7     United States?

8               MS. AL-SORGHALI:  We have no further witnesses

9     and no more evidence by way of proffer.

10              THE COURT:  All right.  Ms. Grill, anything

11     further in the way of evidence or proffer?

12              MS. GRILL:  No, Your Honor.

13              THE COURT:  All right.  Let's turn to argument

14     supporting and against detention.

15       Again, Ms. Grill, there is a presumption of detention,

16     so I'm going to give you the first and last word.

17              MS. GRILL:  Thank you, Your Honor.  And I'll

18     be brief.

19       As the Court knows, I'm presenting Jessica as the

20     primary custodian with Peggy Brown assisting.  I think

21     through the agent's testimony, it's clear that these are

22     ladies who are going to follow what law enforcement asks of

23     them.  So if Ms. Burton asks for them to do something or

24     watch out for something, I don't think there's any doubt

25     that they are going to do that.

1          Neither has had criminal issues in the past, neither

2    would like them.  And clearly I think, again, through the

3    agent's testimony, that just shows, you know, they will

4    participate, they will do what their job is.

5          I'm not a treatment provider, but my educated guess is

6    Cody has substance issues and needs some assistance.  As the

7    Court is well aware, he's not going to get that assistance

8    at CCNO, which is where he currently is.  He wasn't going to

9    get that assistance at the Lucas County Jail either.

10          I think with the appropriate treatment, coupled with

11    these two, quite frankly, strong ladies who would be -- are

12    willing to take on the responsibility of making sure he does

13    the right thing, I think that that is sufficient to show

14    both a lack of running, he's not going to run, and also

15    safety of the community, and so we would request that he be

16    released.

17               THE COURT:  Ms. Al-Sorghali?

18               MS. AL-SORGHALI:  Sure, Judge.

19          Before I get to the Government's view on the proposed

20    custodian, I want to talk a little bit about some of the

21    factors here.

22          First, as it relates to the nature and circumstances

23    of the offense, we want to remind the Court that the

24    defendant is facing a controlled substance charge.  This is

25    a charge in which he's looking at 10 years of mandatory

1     minimum time.  He also has connections out in Phoenix,

2     Arizona, which is where he was getting these drugs and then

3     shipping them back, bringing them back to the Northern

4     District of Ohio.  After his arrest -- most importantly,

5     after his arrest on these charges here -- we haven't even

6     gotten to additional charges that are going to be filed as a

7     result of what we found in the camper.  We're still only

8     talking about these charges here, but after his arrest, he

9     was instructing his wife to go to this camper where more

10    drugs, Narcan, drug packaging materials and three firearms

11    were located.

12         So we heard testimony from Agent Widmer.  He stated

13    that it was his belief that the defendant was trying to

14    either destroy evidence or obstruct or impede an

15    investigation.  I think that goes a long way, if the

16    defendant is released, showing that he couldn't even --

17    while he's in the custody at the jail, couldn't help himself

18    to not do those things while he was in custody at the jail.

19         But I also want to talk about, again, the weight of

20    evidence here.  There were admissions on behalf of the

21    defendant.  He was observed picking up this package that

22    contained 1.2 -- approximately 1.2 kilos of methamphetamine,

23    more than 8,000 fentanyl pills, and he even had narcotics

24    that were concealed on his person and that is -- the

25    narcotics that were concealed in an anal cavity, that is

1    something that a veteran -- a seasoned veteran, whether it

2    be a user or a drug trafficker, that is a seasoned method

3    that is used by drug traffickers.

4        As to the history and characteristics of this

5    defendant, I note in the Pretrial Services' report, he has

6    not been employed for at least two years, so I don't foresee

7    him, even if he is released, somehow getting a job.

8        He has admitted to using multiple drugs.  He has a

9    criminal history, which includes prior drug trafficking

10    convictions, even prior drug trafficking convictions all the

11    way from 2006, from when he was a juvenile, to dating most

12    recently in 2017 for which he was recently incarcerated, and

13    he also has a prior having weapons while under a disability

14    conviction.

15        Obviously, Your Honor, this is someone who is a --

16    again, who is a veteran drug trafficker, who has prior usage

17    of firearms.  And in this situation, agents, through their

18    investigation, led to obtaining more firearms, more drugs

19    from the defendant's statement.

20        And, finally, as to the nature and seriousness and the

21    danger of any person and then the community in general, I

22    argue, Your Honor, that the defendant is a danger to himself

23    with the drug usage.  The Government has serious concerns

24    that he's using methamphetamine, heroin and fentanyl.

25    Certainly any one of these drugs, fentanyl in particular,

1    has the possibility of him overdosing and dying.  I venture

2    to guess that perhaps that's why he had a supply of Narcan

3    in his trailer, which suggests either his experience in

4    himself overdosing, or his experience in observing other

5    individuals that he uses or deals with overdosing.

6         I think that he's a danger to his children, and he's a

7    danger to the community.  You know, these pills are, you

8    know, oftentimes made to look like candy, and I'm not saying

9    that that's the situation here, but here we have someone who

10   was concealing fentanyl pills.  And I don't want a child, I

11   don't want Ms. Brown's children, nor do I want the

12   defendant's children to get into fentanyl pills and mistake

13   them for candy.  The Government certainly does have

14   experience in dealing with that previously.

15        And, Your Honor, as to Ms. Brown's testimony, the

16   Government has concerns with her demeanor with respect to

17   the testimony.  And I mean no disrespect to Ms. Brown, but

18   she certainly seemed surprised when I asked her if she was

19   aware of the defendant's drug trafficking or the

20   circumstances in which he was brought here today.  And after

21   I told her that possession with intent to distribute is

22   essentially drug trafficking, she indicated that she was not

23   aware that that's what it was, and she indicated that she is

24   now aware that that's what the charge is.  And the same can

25   be said for when I asked her if she was aware of what was

1    found in the trailer, and I went over the three guns that

2    were found in the trailer, as well as the drug packaging

3    supplies and additional drugs that were found in the

4    trailer.  She indicated she was not aware, and now she is,

5    all of a sudden, aware of what was found in the trailer.

6    That goes to suggest that either she's not being honest

7    when -- you know, when she says that, or that Mr. Brown, in

8    their numerous conversations that they've had over at the

9    Lucas County Jail, is deliberately withholding information,

10   you know, from her.

11        And while I don't doubt that she would report or Ms.

12   Peggy Brown would report any sort of wrongdoing on behalf of

13   the defendant, I don't believe that Mr. Brown himself would

14   be forthcoming and would be honest with either Ms. Jessica

15   Brown or Ms. Peggy Brown.

16        Your Honor, for those reasons, the Government objects

17   to any form of release of the defendant and further argues

18   that the defendant has not overcome the presumption of

19   detention at this time.

20             THE COURT:  Thank you, Ms. Al-Sorghali.

21        Ms. Grill?

22             MS. GRILL:  Your Honor, I don't have anything

23   further.  I would proffer for the record I did, in fact,

24   myself, explain to Jessica the best I could what he was

25   charged with.  I clearly must not have used the right magic

1    words that Sara has used today, so maybe that's more on me

2    for misunderstanding.  I certainly did read the charge to

3    her.  I did not read the whole complaint to her, but we

4    did -- spoke -- I think Tonya and I talked at least in

5    general about what she was -- he was charged with.  So I

6    don't -- I can't speak for Jessica, but what I think may

7    have been the misunderstanding or not fully understanding is

8    we're now in federal court.  It's not called "drug

9    trafficking" here.  It's called "possession with intent."

10   Maybe she didn't fully understand what that meant, and that

11   should be on me.  Never -- and clearly I should have done a

12   much better job of explaining to her.

13        I think just some folks get into federal court --

14   things are very different here, and I think it can be a bit

15   daunting, even the concept of having a hearing like this, as

16   opposed to a two-minute bond hearing in front of a Common

17   Pleas Court Judge.  So I would take responsibility for not

18   explaining that thoroughly to her.

19        I think that, other than that, I know she's a woman

20   with no criminal history.  She's a woman who has children in

21   her home.  While I appreciate where the Government is coming

22   from regarding children having access to drugs, my client

23   and his wife have been separated for a period of time, so

24   she hadn't -- she had hints, but she hadn't known what he

25   was doing because he wasn't with her.

1          I have no doubt that this -- she will -- any concerns

2     that she will have, she would be certain to raise with

3     Pretrial.  So I think she is definitely a sufficient

4     proposed custodian.

5          And, with that, I don't think I have anything further.

6     Thank you.

7                    THE COURT:  All right.  Thank you, Ms. Grill.

8          Okay.  As I previously stated, the sole issue for my

9     determination today is whether there is a condition or a

10    combination of conditions that will reasonably assure the

11    safety of the community, and other persons, and Mr. Brown's

12    appearance.

13         To sustain detention, the Government must establish by

14    either clear and convincing evidence that no condition or

15    combination of conditions will reasonably assure the safety

16    of other persons or the community, or a preponderance of the

17    evidence that no condition or combination of conditions will

18    reasonably assure Mr. Brown's appearance.  In making this

19    decision, I must take into account the available information

20    concerning the following facts:

21         First, the nature and circumstances of the offense

22    charged, including whether the offense is a crime of

23    violence, a violation of Section 1591, which this case is

24    not, a federal crime of terrorism, or involve a minor

25    victim, or a controlled substance, firearm, explosive, or

1    destructive device.  Obviously, this case focuses on

2    allegations of controlled substances;

3         Second, I consider the weight of the evidence against

4    the person, although this goes solely to the evidence of

5    dangerousness or potentially for flight, not the weight of

6    the accused's guilt because the statute neither requires nor

7    permits pretrial determination of guilt;

8         Second, I consider -- excuse me -- third, I consider

9    the history and characteristics of the defendant, including:

10        (A) that person's character, physical and mental

11   condition, family ties, employment, financial resources,

12   length of residence in the community, community ties, past

13   conduct, history relating to drug or alcohol abuse, criminal

14   history, and record concerning appearance at Court

15   proceeding; and

16        (B) whether at the time of the current offense or

17   arrest, the person was on probation, parole, or other

18   release pending trial, sentencing, appeal at the completion

19   of sentence, or any federal, state, or local violation;

20        Finally, I consider the nature and seriousness of the

21   danger to any person or the community that would be posed by

22   the person's release.

23        Again, to be clear, none of these factors in any way

24   affect the presumption of innocence.

25        As I said earlier, the presumption of detention is

1    applicable here, so I begin with the premise that Mr. Brown

2    be detained, unless Mr. Brown rebuts that presumption.  It

3    is the United States that maintains the overall burden of

4    proving that the request for detention is appropriate here.

5         I've heard quite a bit of testimony today, excellent

6    advocacy by both counsel for the United States and counsel

7    for Mr. Brown.  I'm going to take this matter under

8    advisement, review the evidence and the applicable law more

9    carefully.  If I determine that Mr. Brown is an appropriate

10   candidate for release, then we will schedule a proceeding,

11   at which time, I will review proposed conditions of release.

12        If I determine that release is not appropriate, then a

13   written issue -- excuse me -- a written order will issue

14   outlining the reasons for my determination.

15        Ms. Al-Sorghali, is there anything further on behalf

16   of the United States?

17              MS. AL-SORGHALI:  No, Your Honor.  Thank you.

18              THE COURT:  Ms. Grill, anything further on

19   behalf of Mr. Brown?

20              MS. GRILL:  No, Your Honor.  Thank you.

21              THE COURT:  Mr. Brown, sir, is there any

22   problems with the audio or video today?

23              THE DEFENDANT:  No, sir.  Thank you.

24              THE COURT:  Did you understand everything that

25   just occurred in court today, sir?

51

1        THE DEFENDANT:  Yes, sir.

2        THE COURT:  All right.  Well, thank you, all.

3   That will adjourn our proceeding for this afternoon.  And

4   with that, we'll either reassemble for a review of

5   conditions of release, or you'll receive my written order on

6   the docket.

7        Thank you, all.

8        MS. GRILL:  Thank you, Your Honor.

9        THE COURT:  Thank you.

10        (Proceeding concluded)

11                        -  -  -

12            **C E R T I F I C A T E**

13        I certify that the foregoing is a correct transcript
    of the record of proceedings in the above-entitled matter
14   prepared from my stenotype notes.

15        */s/ Stacey L. Kiprotich            5/23/2022*
        *STACEY L. KIPROTICH, RMR, CRR          DATE*
16

17

18

19

20

21

22

23

24

25